# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 1272 | **DATE** | 4/9/2003 |
| **CASE TITLE** | Dunkin'Donuts Inc. vs. N.A.S.T., Inc., et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Enter Memorandum Opinion and Order.  For the reasons set forth in this memorandum opinion and order, most of Dunkin's effort to obtain a partial summary judgment is successful, although a minor party may have to be deferred pending further discovery.  (36-1)

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | **number of notices** | **Document Number** |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | APR 1 1 2003 | |
| | Notified counsel by telephone. | | **date docketed** | 53 |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | **docketing deputy initials** | |
| | Copy to judge/magistrate judge. | | 4/9/2003 | |
| SN | courtroom deputy's initials | | **date mailed notice** | |
| | | | SN | |
| | | Date/time received in central Clerk's Office | **mailing deputy initials** | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DUNKIN' DONUTS INCORPORATED,          )
                                      )
                    Plaintiff,        )
                                      )
          v.                          )      No.  02 C 1272
                                      )
N.A.S.T., INC., et al.,               )
                                      )
                    Defendants.       )

DOCKETED
APR 1 1 2003

MEMORANDUM OPINION AND ORDER

     This action began with a Complaint by Dunkin' Donuts
Incorporated ("Dunkin'") against four defendants (N.A.S.T., Inc.,
SK Donuts, Inc., Sunny Cherian and Robert Stambolic), based on
their asserted fraud, breach of contract and trademark
infringement in connection with the operation of several Dunkin'
franchises in Illinois and Wisconsin (federal jurisdiction was
properly invoked on diversity of citizenship grounds).  Along the
way Cherian and N.A.S.T. (purely for convenience collectively
referred here to as "Cherian," treated as a personified singular
male noun) advanced several counterclaims, including claims
stemming from Dunkin's allegedly improper use of the Advertising
Fund ("Fund") provided for in the parties' Franchise Agreements
("Agreements").

     After Dunkin' filed a motion for partial summary judgment
attacking some of those counterclaims, Cherian responded in part
by dropping (1) the counterclaims asserting negligence, unjust
enrichment and conversion and (2) any possible claims arising

from a breach of fiduciary duty (C. Mem. 8 n.4). That has left for current resolution Cherian's Fund-related counterclaims that charge Dunkin' with breaches of contract and of the covenant of good faith and fair dealing. For the reasons set forth in this memorandum opinion and order, most of Dunkin's effort to obtain a partial summary judgment is successful, although a minor part may have to be deferred pending further discovery.

### Rule 56 Principles

Rule 56 principles impose on movant Dunkin' the burden of establishing the lack of a genuine issue of material fact (<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986)). For that purpose this Court must "consider the evidentiary record in the light most favorable to the non-moving party...and draw all reasonable inferences in his favor" (<u>Lesch v. Crown Cork & Seal Co.</u>, 282 F.3d 467, 471 (7th Cir. 2002)). And <u>Pugh v. City of Attica</u>, 259 F.3d 619, 625 (7th Cir. 2001) has echoed the teaching of <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986):

> A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

As with any summary judgment motion, this Court accepts nonmovant Cherian's version of any disputed facts, but only so long as it is supported by record evidence. What follows is drawn from the parties' submissions when viewed from that

2

perspective.[1]

## Factual Background

Cherian and Dunkin' entered into the Agreements (Exs. 2B, 2C and 2D to D. Compel Mem.) that set out numerous obligations for both parties. For one thing, all Dunkin' franchisees, (including Cherian) must pay 5% of gross sales into the Fund managed by Dunkin (C. St. ¶4). Agreement §3E (C. St. ¶40) obligates Dunkin':

> [t]o administer The DUNKIN' DONUTS Franchise Owners Advertising and Sales Promotion Fund (the "Fund") and to direct the development of all advertising and promotional programs. One-fifth of FRANCHISEE's 5% advertising contribution (1 % of the GROSS SALES of the SHOP) will be utilized, at the discretion of DUNKIN' DONUTS, to provide for the administrative expenses of the Fund and for programs designed to increase sales and enhance and further develop the public reputation and image of DUNKIN' DONUTS and the DUNKIN' DONUTS SYSTEM. The balance, including any interest earned by the Fund, will be used for advertising and related expenses. Contributions to the Fund in excess of 5% of GROSS SALES shall be used in accordance with the programs to which they relate. The content of all advertising, as well as the media in which the advertising is to be placed and the advertising area, shall be at the discretion of DUNKIN' DONUTS. Upon request, DUNKIN' DONUTS will provide FRANCHISEE a statement of receipts and disbursements of the Fund, prepared by an independent certified public accountant, for each fiscal year of the

---

[1] Each side has complied with this District Court's LR 56.1, designed to facilitate the resolution of Rule 56 motions by highlighting the existence or nonexistence of factual disputes. All of the parties' filings will be identified by "C." for Cherian and "D." for Dunkin'. As for the LR 56.1 submissions, this opinion cites to the two LR 56.1(a)(3) statements as "St. ¶ --." Other abbreviations refer to the parties' exhibits ("Ex.") and substantive memoranda ("Mem.") and to their memoranda on Cherian's Motion To Compel ("Compel Mem.").

Fund....

Ernst & Young performs an annual independent audit of the Fund (D. St. ¶15) "in accordance with generally accepted accounting principles" (C. Ex. A at 6). According to the audit report for fiscal year 2000, Dunkin' received $116,574,786 from advertising fee contributions from franchisees across the nation (C. Ex. A at 4), of which amount $23,051,432 was allocated to the Indirect Fund used for administrative expenses (C. Ex. A at 13). In 1999 Dunkin' received $107,535,790 from advertising fee contributions (C. Ex. A at 4), of which sum $21,124,139 was allocated to the Indirect Fund.

To return to the 2000 year, Cherian claims that instead of the amount of administrative expenses as identified by Ernst & Young, the total cash outlays for administrative expenses in that year ($24,631,214) should have been the numerator in determining whether the one-fifth limitation on such expenses in Agreement §3E had been exceeded (C. Mem. 3-4). Moreover, Cherian notes three categories of expenses (Events/Training Expenses, Market Development Expenses and Miscellaneous Expenses) that Ernst & Young categorized as advertising or related expenses, but that Cherian claims should instead be labeled administrative expenses (C. Mem. 4)

Additionally, the Ernst & Young 2000 audit report

classified numerous expenditures -- including cross-functional employees, rent, accounting services, data processing services and other operating expenses -- as being allocated between the Fund and Dunkin' (D. St. ¶17). Cherian claims that those were improperly expensed (C. Mem. 6). Cherian also claims that Dunkin' received settlement payments from franchisees but failed to allocate the appropriate portion of those payments to the Fund (C. Mem. 6-7).

Cherian also asserts that Dunkin' improperly failed to return excess payments for field marketing expenses (C. Mem. 5). Ernst & Young's audit partner Larry Davidson ("Davidson") explained how those expenses are calculated (D. Ex. 3 ¶7):

> In the beginning of each fiscal year, Dunkin' Donuts estimates the amount of administrative expenses that will be spent on the Advertising Fund for the upcoming fiscal year. At the end of each fiscal year, Dunkin' Donuts compares the amount budgeted for the Advertising Fund with the amount of money actually spent. If the amount budgeted for the Advertising Fund exceeds the amount spent, and it is de minimis, it is deemed immaterial in accordance with normal accounting practices. If the amount budgeted for the Advertising Fund exceeds the amount spent, and it is not de minimis, monies are rebated to the Advertising Fund. Ernst & Young verifies these expenditures in its audit of the Advertising Fund.

According to Davidson, even though Dunkin's budget overestimated field marketing expenses by approximately $86,000 in 2000, that amount was "deemed immaterial by accounting standards in light of the total expenditures of

the Fund" (D. Ex. 3 ¶8). In 1999, when Dunkin' overestimated the same expenditures by an amount that Ernst & Young deemed material, approximately $200,000 was returned to the Fund (id.). In that respect Cherian claims that Dunkin's overestimate came to $500,000, so that it improperly retained $300,000 from the field marketing expenses (C. Mem. 5).

Allied Domecq QSR ("Allied Domecq") is an unincorporated association affiliated with Dunkin' Donuts, Baskin-Robbins and Togo's (C. Mem. 6). Allied Domecq and those three brands entered into a distributorship agreement with Pepsico that provided a $1 million rebate to Togo's Advertising Fund (C. Mem. 6). Dunkin' has a Marketing Operating Philosophy document ("Operating Philosophy") that addresses such supplier rebates (Valas Aff. Ex. B at DDI 2517):

> Should any or all of Allied Domecq QSRs brands enter into a contract that provides for a rebate for product/supplies used in all of our Allied Domecq QSR's brands franchised retail stores, the income will be split proportionally among all brands, based on the conditions of the rebate, and will be applied to each brand's respective Advertising Funds.

In this instance no contribution was made to the Dunkin' Advertising Fund, and no proportionate split among the brands was made (C. Mem. 6).

### Choice of Law

Generally a federal district court sitting in diversity must follow the choice of law rules of the state in which it

sits (<u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496-97 (1941)).  But in this case all of the Agreements have a choice of law provision that designates Massachusetts law as applicable to disputes between the franchisor and franchisee (Ex. 1B ¶16A, Ex. 1C ¶16A and Ex. 1D ¶16A to D. Compel Mem.), and each side has agreed to that designation law (C. Mem. 7, D. Mem. 5-6 & n.3).  This opinion therefore looks to substantive Massachusetts law.

## Request for Additional Discovery

Cherian has asked this Court to delay decision on summary judgment until he has had the opportunity to acquire more information through the discovery process (C. Mem. 1). According to Request No. 45 of Cherian's First Request for the Production of Documents (quoted at C. Compel Mem. 2), Cherian sought:

> All documents showing in full and complete detail all expenses paid by Dunkin' Donuts, Inc. with franchisee advertising funds, including all documents showing or describing how each such expense was related to advertising or designed to increase franchise sales, from 1996 to date.

In response Dunkin' produced only the Fund audit summaries by Ernst & Young and the Operating Philosophy document -- it did not produce, for example, its advertising expense ledgers. Cherian then filed its Motion To Compel the production of the expense ledgers that Dunkin' maintains for its receipts and expenditures from the Fund (C. Compel Mem. 1), supported

7

primarily by the affidavit of Cherian's attorney Rory Valas ("Valas"). Apparently having made somewhat of a career of representing franchisees against Dunkin', Valas asserts that further discovery will allow Cherian to find specific facts sufficient to withstand summary judgment.

This court had delayed ruling on that motion to compel in anticipation of the prospect that some of Cherian's counterclaims could be decided as matters of law. And as hereafter reflected in this opinion, almost all of them can be and are decided in that fashion. Just one of them poses potential questions of fact that would preclude summary judgment if Cherian can find evidence along one of the lines adverted to in Valas' affidavit, which tries to paint a picture of Dunkin's assertedly rampant Fund-related violations. Because Cherian provides no other supporting information to back up Valas' claims, this opinion must consider the effect to be ascribed to Valas' statements as well as Dunkin's right to be protected from unnecessary and burdensome discovery.

As explained later, Cherian will be allowed to proceed with discovery of the Fund expense ledgers for inquiry into a single area. But because of "the aphorism that discovery is not to be used as a fishing expedition" (EEOC v. Harvey L. Walner & Assocs., 91 F.3d 963, 971 (7th Cir. 1996), if it

develops that such further discovery fails to corroborate Valas' conclusory affidavit, Cherian will be obligated to reimburse Dunkin' for all of its costs and expenses in producing the further discovery.

### Allegedly Excessive Administrative Expenses

Cherian claims that Dunkin spent more of the Fund on administrative expenses than the one-fifth allowed by Agreement §3E (C. Mem. 4). To succeed on such a breach of contract claim under Massachusetts law, Cherian must demonstrate (1) that the parties reached a valid and binding agreement, (2) that Dunkin' breached the terms of the agreement and (3) that Cherian suffered damages from the breach (<u>Michelson v. Digital Fin. Servs.</u>, 167 F.3d 715, 720 (1st Cir. 1999)). Analysis reveals that to this point Cherian strikes out on all of his attempts to show how Dunkin' assertedly breached the terms of the Agreements -- but while almost all of those shortfalls stem from failures of law, one of them represents a possibly legitimate need to obtain added facts that could perhaps be acquired through further discovery.

First Cherian points to the $24,631,214 identified in the Ernst & Young annual report for 2000 as "total Advertising Expenses" as assertedly representing the amount designated in Agreement §3E as "franchisee advertising

contributions" (C. Mem. 3-4). But according to the Ernst & Young audit, the proper number to be attached to that label is the $23,051,432 listed as "Advertising fee contributions" under the Revenues side (C. Ex. A at 13). That latter figure brings the percentage of the total franchisee advertising contributions used on administrative expenses to 19.77%, just below the one-fifth allowed by Agreement §3E.

Cherian seems to be arguing that the accounting in that respect should be determined on a cash expenditure basis rather than on the allocation basis employed by Ernst & Young. But that contention has to be a nonstarter, because the certification of the allocation method by an independent accounting firm cannot be challenged as impermissible simply on Cherian's (or Valas') say-so.[2] That is after all why an independent evaluation is sought in the first place, and Cherian will not be heard to call for a different methodology just because he prefers the answer it would provide.

Cherian's next contention is that certain items categorized as advertising expenses for Fund purposes do not fit under that rubric (C. Mem. 4). Specifically Cherian identifies "Events/Training Expenses," "Market Development

---

[2]     It is readily apparent that the consistent application of one method over a period of years will produce long-term results very close to those that would be generated under the other method when consistently applied.

10

Expenses" and "Miscellaneous Expenses" as expenditures that he claims "any reasonable person would categorize as administrative expenses, not advertising expenses" (C. Mem. 4). Allocation of any one of those items to administrative expenses would bring that category over the 20% limit allowed by Agreement §3E.

But here too the classifications have been made by independent auditor Ernst & Young, which places "Events/ Training Expenses," "Market Development Expenses" and "Miscellaneous Expenses" under the Expenses of the Fund (C. Ex. A at 11). According to Ernst & Young the total Expenses of the Fund (including those specific items) fall within the definition of "Advertising Costs" (C. Ex. A at 7).

Against that, Cherian's attempted reliance on a hypothetical "reasonable person" to illegitimatize those items as advertising expenses (C. Mem. 4) falls flat. Cherian's citation of the affidavit by attorney Valas (who is scarcely a Fed.R.Evid. 702 expert on the subject) does not suffice to create a genuine issue of material fact as against the Ernst & Young audit report. Cherian's request for further investigation is no better than a quest to see if he can turn up some factual basis for his claim, and it must be and is rejected under the circumstances.

Cherian's third argument is that advertising expenses

were used "to pay for supposed cross-functional employees and other employees who had little, if any, involvement with advertising or marketing and whose primary, if not sole, responsibility was over operational issues" (C. Mem. 6). Once again that runs into the wall of the independent audit: Ernst & Young analyzed the impact of cross-functional employees and approved the manner and extent to which "certain expenses related to payroll, market research, professional fees, travel, office supplies, public relations, equipment rental, utilities, depreciation and other miscellaneous charges were allocated" (D. St. ¶17). In response Cherian attempts to point to Valas Aff. ¶32, but that simply states a different view without evidentiary support. Again Cherian fails to meet the Rule 56 requirement of identifying a bona fide factual issue.

Cherian may or may not fare better as to his fourth contention, which asserts that "Dunkin' improperly expensed operational expenses through the Fund including various costs of its regional offices, such as rent, office supplies, and automobile expenses" (C. Mem. 6). Ernst & Young audited those expenditures and found that "[o]ther expenditures are similarly paid in accordance with their use by the Fund: 'The Fund is also charged for rent, accounting services, data processing and other operating expenses by Dunkin' Donuts,

Inc.'" (D. Ex. A ¶6), but Valas Aff. ¶31 refers to Dunkin'
documents that purportedly support Cherian's position.
Because that speaks of (without however naming) documents
that are assertedly known to Valas, Cherian will be required
to supplement that statement with an identification of such
documents within 14 days after the issuance of this opinion
-- and if that can be done, further discovery will be allowed
to pinpoint any genuine issue of material fact on that score.

In his fifth attempt to establish an abuse of the Fund,
Cherian claims that Dunkin' received settlement payments from
franchisees for their failures to pay advertising fees, but
it failed to meet a purported requirement to place a portion
of those funds into the Fund (C. Mem. 6-7). But having made
that claim, Cherian has not identified any source of a legal
obligation on Dunkin's part to put such settlement amounts
into the Fund. Tellingly, Cherian failed even to mention
that claim in his Amended Complaint. No discovery to fish
out information on the topic will be permitted.

### Field Marketing Expenses

Cherian's next attempt to show a breach of contract by
Dunkin' asserts that it unlawfully retained Fund money
allocated to field marketing expenses (C. Mem. 5). On that
score Cherian argues that while Dunkin' received from the
Fund, as the estimated expenses for that purpose, $4 million

13

in 2000 and $3.8 million in 1999, it failed to spend those entire amounts on acceptable marketing expenses. As stated earlier, Cherian claims that Dunkin' improperly retained portions of the field marketing expenses totaling $86,000 in 2000 and $300,000 in 1999 (C. Mem. 5).

But Ernst & Young's Davidson has responded directly to that by stating that Cherian's claim "is not accurate" (D. Ex. 3 ¶7). Davidson continues (id. ¶8):

> In 2000, Dunkin' Donuts overestimated the field marketing expenses of the Advertising Fund by approximately $86,000. This amount was deemed immaterial by accounting standards in light of the total expenditures of the Advertising Fund. In 1999, Dunkin' Donuts overestimated the expenses of the Advertising Fund. This amount was deemed material and approximately $200,000 was reallocated to the Advertising Fund.

Again Valas Aff. ¶¶20-22, which simply recite the same numbers together with an added assertion that the $200,000 reallocation in 1999 was the result of a $500,000 overestimate of which Dunkin' kept the $300,000 balance (id. ¶22),[3] do not really address the relevant issue: What does GAAP call for in such a situation? In that respect Ernst & Young has expressly certified that the audit was conducted "in accordance with generally accepted auditing standards" (D. Ex. 3A at DDI 2279). With Cherian not having put that determination in issue (something that would not be dependent

---

[3] More is said on this subject in the next paragraph of the text.

on discovery, but is rather a function of audit principles),
his claim fails in Rule 56 terms.

Before this opinion moves to the next topic, however, a
further word should be said about Valas Aff. ¶22, which
adverts to an initial $500,000 overestimate in Field
Marketing Expenses for 1999 -- a figure that does not appear
in any of the Dunkin' documents in this case.  Dunkin'
suggests that the only potential source for such an assertion
would appear to be a prohibited one -- documents from the
dismissed action in <u>Dunkin' Donuts v. Curcio</u>, NO. 01 C 5687
(N.D. Ill.) that were restricted from disclosure by the
September 3, 2000 dismissal order in that case.  In that
respect, this Court's January 8, 2003 oral ruling denied
Cherian's request to use documents obtained in the <u>Curcio</u>
case because Cherian's counsel Valas could not affirmatively
show that the documents would have become known if he had not
been involved in the <u>Curcio</u> case.  Some further explanation
by Valas is necessary -- and promptly.

### Distribution of Marketing Rebate

Cherian next claims that Dunkin's sister brand Togo's
received a $1 million rebate from a marketing agreement with
Pepsico that should have been split proportionately among
Togo's, Dunkin' Donuts and Baskin-Robbins (C. Mem. 6).  Here
too Cherian seeks to rely primarily on Valas' unsupported

15

affidavit for support, but that deficiency need not be explored further because Cherian's counterclaim lacks any foundation to begin with. Simply put, because Cherian and Dunkin' never reached an agreement as to the distribution of rebate funds, Cherian (and other Dunkin' franchisees as well) have no right to share in the supplier's rebate.

Cherian attempts to argue that Dunkin's earlier-quoted Operating Philosophy provides the operative terms as to supplier rebates (C. St. ¶20). But that document is not a contract between Dunkin and Cherian (indeed, it is not a contractual undertaking on Dunkin's part at all). Instead the Operating Philosophy itself expressly specifies that "[i]t is not intended to supersede or take the place of any terms contained in the franchise Agreement or any other agreements the Franchisee has with Dunkin' Donuts Incorporated and/or its affiliate companies" (Valas Aff. Ex. B at DDI 2514).

Finally (and really conclusively), nowhere do the Agreements make any reference at all to any such document. To the contrary, the Agreements contain an explicit and typical integration clause that says the Agreements "and the documents referred to herein shall be entire, full and complete agreement" between Dunkin' and Cherian (D. St. ¶14A). In sum, Cherian simply has no right to sue for a

16

claimed violation of the Operating Philosophy.[4]

## Fair Franchising Standards

Still another instance of a groundless claim by Cherian
is provided by its current assertion that Dunkin' breached
its contract by violating certain of The American Association
of Franchisees and Dealers Fair Franchising Standards
("Association"). Even apart from the troubling (if not
indeed dispositive) fact that there is no hint of such a
claim mentioned in Cherian's counterclaims, it is fundamental
that Dunkin's duties to Cherian are defined by the
Agreements, not by some set of guidelines proposed by an
outside organization. With Cherian and Dunkin' having
entered into a detailed and integrated document such as the
Agreement, its provisions cannot be trumped (or modified) by
such external criteria as the standards of the Association.

## Covenant of Good Faith and Fair Dealing

Cherian next advances an asserted breach by Dunkin' of
the covenant of good faith and fair dealing. Massachusetts

---

[4] Even apart from what has been said in the text, Cherian
comes up empty. In part the Operating Philosophy states that any
proportionate split of rebates is subject to the terms and "based
on the conditions of the rebate" (Valas Aff. Ex. B at DDI 2517).
According to the only information provided in the record, the
Uniform Franchise Offering Circular, the rebate by Pepsico
allowed for Togo's use of the money "on the promotion of the
Togo's brand, including but not limited to advertising, public
relations and general marketing activities" (D. St. ¶24), with no
mention being made of any supposed need to split the rebate with
Dunkin' and Baskin-Robbins.

17

law implies such a covenant in every commercial contract, even those between sophisticated businesspeople (<u>Anthony's Pier Four, Inc. v. HBC Assocs.</u>, 583 N.E. 2d 806, 821 (Mass. 1991)). That requires contracting parties to deal with each other honestly and in good faith, not only in their performance of the contract but also in their enforcement of the contract terms (<u>Hawthorne's, Inc. v. Warrenton Realty, Inc.</u>, 606 N.E.2d 908, 914 (Mass. 1993)).

Dunkin' moves for partial summary judgment on that aspect of Cherian's counterclaims as well. In opposition, Cherian recites the same arguments and the same unsupported Valas affidavit that have already been discussed in the breach of contract section of this opinion.

What has been said in that section controls here as well. Nothing in Cherian's submission suggests that any areas in which Dunkin' has fulfilled its contractual obligations are somehow tainted by its not having treated Cherian honestly and in good faith in doing so. To the extent then that Cherian's breach of contract claims fail as a matter of law, they must succumb in terms of the implied covenant as well. By the same token, as to the one area in which Cherian has properly identified a potential question of material fact that warrants further discovery, that will apply to both types of claims of Dunkin's asserted breach:

contractual and implied.

## Injunctive Relief

Finally Cherian requests "entry of an injunction which would require Dunkin' to disgorge itself and to return to the Advertising Fund all amounts unlawfully taken from the Advertising Fund and to use those funds for advertising and marketing" (C. Mem. 14). That must obviously be denied for now, subject to potential future consideration if Cherian is ultimately found to be entitled to some relief.

## Conclusion

For by far the most part Dunkin' has shown its entitlement to a partial summary judgment, although one limited area may remain open for possible further factual development. As the prevailing party in almost all respects, Dunkin' will be expected promptly to tender a proposed form of order that embodies the holdings in this opinion (and of course to provide a copy of that proposed order to Cherian for its comments as well). In that regard Dunkin's counsel should consider whether there is any room for a possible Rule 54(b) determination at this point (though that may seem doubtful in light of the limited possible discovery contemplated here).

Lastly, because Cherian's counterclaims have not yet been fully resolved, counsel should be mindful of the Supreme

Court's teaching in <u>Curtiss- Wright Corp. v. General Electric Corp.</u>, 446 U.S. 1, 8, 10-11 (1980) if at a future point Dunkin' were to prove successful on its own claims while Cherian's counterclaims still remained short of a final resolution. In that event, consideration of the possible propriety of a Rule 54(b) determination would be appropriate.

Milton I. Shadur
Senior United States District Judge

Date: April 9, 2003