# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 1272 | **DATE** | 6/10/2003 |
| **CASE TITLE** | Dunkin Donuts vs. NAST | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Each of Cherian's four withdrawn claims shares a common flaw. Non could have been asserted in the objective good faith that is demanded by Section 1927. Accordingly Dunkin is entitled to be reimbursed for the attorneys' fees and expenses that it incurred in seeking the defeat of those claims before Cherian, who should never have advanced them in the firs place, withdrew them in the face of Dunkin's Rule 56 motion. This action is set for a status hearing 6/19/03 at 8:45 a.m. to discuss the timing and procedures for quantification.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | JUN 1 2 2003 date docketed | |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | | 65 |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | deputy initials | |
| | Copy to judge/magistrate judge. | | 6/10/2003 | |
| | | 03 JUN 10 PM 4:41 | date mailed notice | |
| SN | courtroom deputy's initials | Date/time received in central Clerk's Office | SN mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DUNKIN' DONUTS INCORPORATED,         )
                                     )
                Plaintiff,           )
                                     )
v.                                   )    No. 02 C 1272
                                     )
N.A.S.T., INC., et al.,              )
                                     )
                Defendants.          )

MEMORANDUM OPINION AND ORDER

This diversity action between Dunkin' Donuts, Inc. ("Dunkin'") and certain of its franchisees--as before, this opinion will continue to use the name "Cherian," treated as a personified singular male noun, to refer to franchisee Sunny Cherian and N.A.S.T., Inc.--has been distressingly acrimonious.[1] In any event, Cherian met Dunkin's Complaint for asserted violation of the Franchise Agreements between them with an attack--a 96 paragraph, nine count Counterclaim.

When Dunkin' then filed a motion for partial summary judgment as to the matters advanced in that Counterclaim, Cherian opted to withdraw the aspects of its Counterclaim that had been

---

[1] As this Court has said earlier in the case, Cherian's attorney Rory Valas ("Valas") appears to have made somewhat of a career out of franchisee litigation against Dunkin'. It is not of course blameworthy for a lawyer to utilize acquired skills on a repeated basis (something that can obviously increase efficiency and that is one of the main reasons for the increased tend toward specialization in the practice of law), but it regrettably seems that some of the prior collisions between other Valas clients and Dunkin' (and unfortunately between Valas and Dunkin's counsel) have engendered some bad blood.

sought to be grounded in negligence, unjust enrichment, conversion and breach of fiduciary duty. Cherian's present cover story for taking that step, as set out at page 2 of its just-filed "Final Statement," is this:

> For strategic reasons, in order to streamline its claims and to prevent any distraction from the presentation of the principal claims of breach of contract and breach of the covenant of good faith and fair dealing, the defendants filed a motion to amend their counterclaims to drop the claims asserted in the alternative of negligence, conversion and unjust enrichment and to remove any references to fiduciary duties in connection with the advertising fund.[2]

Dunkin' then responded by asking to be reimbursed for the attorneys' fees and expenses that it had incurred in defending against those contentions before Cherian dropped them. Extensive briefing has followed, most recently with the filing of Cherian's "Final Statement" referred to earlier.

It should be made clear at the outset that Dunkin' has been selective in its current motion: It is <u>not</u> now challenging Cherian's right either to dispute Dunkin's claims or, in doing

---

[2] [Footnote by this Court] That rationalization will not be credited just on Valas' say-so. Indeed, when Dunkin' originally moved for partial summary judgment on Cherian's Counterclaim, Valas was more candid, stating that "Cherian decided that he would remove the claims by amendment because they are unlikely to bring much to the presentation of the case" (Mem. in Opp. at 8 n.4). And contrary to the language quoted in the text, the dropped claims were asserted in the conjunctive--as added counts--and not "in the alternative." So the natural inquiry is why they were injected into the litigation in the first place--and in that respect, given the nature of the current motion referred to in the next sentence of the text, the objective good faith of the dropped claims must be examined here.

2

so, to have advanced other claims of its own. Instead the question is whether the four theories of counter-recovery to which Dunkin' and its counsel were compelled to devote attention before Cherian folded his tent were not asserted in objective good faith (see 28 U.S.C. §1927 ("Section 1927")) or were even advanced in bad faith (sanctionable under the inherent power doctrine articulated in <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 43-51 (1991)). To that end each of the four types of counterclaim theories must be examined separately.

Although it has been named last among the four contentions at issue, the breach-of-fiduciary-duty claim has occupied most of Cherian's attention: Of the 12 tightly-constructed pages in Valas' Final Statement (in that respect, to the naked eye it appears that Cherian's submissions squeeze a good deal more on each page than this District Court's LR 5.2 permits),[3] fully half (five pages plus the bulk of the Final Statement's §V, which is titled "Further Discussion") are devoted to the fiduciary duty subject, and a substantial part of the long excerpts from the Harold Brown treatise, <u>Franchising Realities and Remedies</u> (rev.

---

[3] Unlike our Court of Appeals, which polices Fed. R. App. P. 32 with a vengeance, by striking briefs that do not comply with its detailed requirements and even by sanctioning offending counsel, this Court has never sought to enforce the somewhat comparable requirements of this District Court's rules--see LR 5.2 and 7.1. In material part that is because this Court has no recollection of ever turning down a request to exceed the 15-page limit prescribed by LR 7.1, so there is really no incentive for any lawyer to submit any nonconforming papers.

3

ed. 1998)(cited here simply as "Brown"), that Valas has attached as Ex. A to the Final Statement treats with the same subject. This opinion will accordingly turn to that topic first.

Cherian's approach to that issue is really astonishing. In all of its discussion and its extensive citation to caselaw, it devotes only a brief footnote 8 to the controlling fact that the Franchise Agreements involved in this litigation flat-out negate the existence of a fiduciary duty on Dunkin's part. Franchise Agreement ¶11.A, which is part of the paragraph that is designated in the document's margin (where the subject matter of each provision is summarized) as "Relationship of Parties," specifies unambiguously:

> The parties agree that this Agreement does not create a fiduciary relationship between DUNKIN' DONUTS or its subsidiary and FRANCHISEE.[4]

Indeed, even if that express disclaimer were not dispositive on the subject (as it clearly is), it is worth noting that a portion of the Brown text--which is highly friendly to the franchisee side of the franchise relationship, for the author

---

[4] [Footnote by this Court] It is exemplary of the groundless arguments that permeate the submissions by Cherian's counsel that footnote 8 misleadingly states "the language was tucked into fine print in the franchise agreement...." In fact the entire 10-plus pages of the Franchise Agreement are all in the same size type--single spaced because of the many subjects that must necessarily be covered in such an integrated agreement. Many provisions in each Agreement were stricken or modified--the hallmark of a negotiated transaction--but no change was made in the express disclaimer of any fiduciary relationship.

says that he was the first to propound a fiduciary duty notion in conjunction with such a relationship[5]--candidly acknowledges (in a portion of his text that is not cited or quoted by Cherian, Brown §9.08 at 9-66):

> Most courts now reject the concept that there is a general fiduciary relationship in all franchising, though almost all accept the implied covenant or duty of good faith and fair dealing.

Significantly in that respect, it should be repeated that although this Court's April 9, 2003 memorandum opinion and order also granted the principal part of Dunkin's motion for summary judgment to negate any liability on Cherian's claim of its breach of the implied covenant of good faith and fair dealing, Dunkin' has **not** sought to include that claim among its current targets (that is, no effort is being made to recoup its lawyers' fees devoted to that claim). And to return to the specific issue of fiduciary duty, Cherian has failed to identify a single court authority that supports his approach to that issue in conjunction with a rejection, as somehow unenforceable, of a contractual disclaimer such as that contained in the Franchise Agreements.

Nothing then provides any good faith justification for Cherian's original advancement of a breach of fiduciary duty claim, which he then abandoned only after Dunkin's counsel had

---

[5] In that regard Brown §9.08 at 9-65 n.2 cites his 1971 law review article, "Franchising: A Fiduciary Relationship," 49 Tex. L.Rev. 650.

5

devoted time and effort to defeating it. That portion of the fees and expenses of Dunkin' will be shifted, to be borne by Cherian's counsel pursuant to Section 1927.

For nearly two decades our Court of Appeals has taught that Section 1927 embodies an objective good-faith test in determining whether a lawyer has "multiplie[d] the proceedings in any case unreasonably and vexatiously": In re TCI Ltd., 769 F.2d 441, 446 (7th Cir. 1985) first announced that principle, and the same teaching has been reiterated with some frequency since then (one recent example is IDS Life Ins. Co. v. Royal Alliance Assocs., Inc., 266 F.3d 645, 654 (7th Cir. 2001), which quoted the TCI holding that "when an attorney recklessly creates needless costs the other side is entitled to relief"; see also the discussion of Seventh Circuit law in Gregory Joseph, Sanctions: The Federal Law of Litigation Abuse §§23(A)(2), at 387 and 23(B)(1), at 395, 397 (3d ed. 2000)). TCI's language might well have been written for this case.

Before this opinion leaves the subject of the fiduciary duty claim, three points should be made that apply both to that claim and to the other claims dealt with in this opinion. Here they are:

> 1. Cherian's counsel continue to point to Dunkin's not having given the 21-day notice under Rule 11(c)(1)(A) that allows one free bite to the offending litigant. Although no

6

such notice requirement attaches to court-initiated sanctions under Rule 11, Rule 11(c)(2)(B) also appears to preclude the imposition of monetary sanctions in light of Cherian's withdrawal of the claims at issue. But any unavailability of Rule 11 as a vehicle for sanctions should make no difference, for TCI and other cases in this Circuit teach that the objective good faith standard under Section 1927 is the same as that imposed by Rule 11(b).

2. As for the Chambers inherent power approach, this Court finds it unnecessary to go so far as to find actual bad faith on the part of Cherian or his counsel, as that doctrine requires. Even though there is surely room for a reasonable inference that Cherian's (and his lawyers') inclusion of the added claims had harassment as its purpose, Chambers is simply not needed to impose liability on Valas in light of Section 1927--and as to Cherian himself, this Court views it as undesirable to probe the lawyer-client relationship to explore any potential scenario in which Cherian's counsel might have asserted various legal theories as the consequence of their clients' bad faith motivation.

3. In part because of that same undesirability of invading the lawyer-client relationship, which would perforce involve inquiry into privileged communications, this Court will leave it to Cherian and his counsel to

7

determine who should ultimately bear the monetary sanctions imposed under this opinion, and to what extent.

To turn now to Cherian's now-abandoned claim of negligence, Dunkin' has correctly pointed to the "Moorman doctrine" under which parties to a commercial transaction such as those involved here cannot recover under a negligence theory for economic losses (Moorman Mfg. Co. v. Nat'l Tank Co., 91 Ill.2d 69, 435 N.E.2d 443 (1982)). Moorman has consistently been followed not only by Illinois courts (of course) but also (just as understandably) by federal courts applying Illinois law--see, e.g., Valenti v. Qualex, Inc., 970 F.2d 363, 369 (7th Cir. 1992), which cites numerous cases to the same effect (including those applying the identical principle to contracts for products and for services) and repeats this summary of the doctrine in Bethlehem Steel Corp. v. Chicago E. Corp., 863 F.2d 508, 523 (7th Cir. 1988):

> [T]he basic principle of Moorman is that the type of loss, not the defendant's conduct, is critical. When only economic loss is incurred, the plaintiff may only raise contract theories even if the defendant's alleged conduct constituted a tort as well as a breach of contract.

Cherian attempts to counter by citing to a Massachusetts District Court opinion that, although it recognizes the same "economic loss" doctrine under Massachusetts law, carves out a possible exception to that doctrine for a claim of negligent performance of contractually assumed duties (Arthur D. Little Int'l, Inc. v. Dooyang Corp., 928 F.Supp. 1189, 1203 (D. Mass.

8

1996)). But whatever the arguable validity of that exception to the "economic loss" doctrine might perhaps be under Massachusetts law,[6] Cherian's counsel have glossed over (or more accurately have totally ignored) the fact that any common law tort claims sought to be asserted by Cherian are controlled by Illinois law, unlike the breach of contract claims (as to which the Franchise Agreements have a choice of law provision that specifies the applicability of Massachusetts law).[7]

As to tort claims, for more than three decades Illinois has supplanted the old automatic "place of injury" standard with a "most significant contacts" test (what this Court has often characterized as a "center of gravity" approach) for determining the choice of substantive law. That principle, repeated time and

---

[6] In that respect it should be noted that Cherian's Counterclaim Count V (the one that was captioned "Negligence--Advertising Funds") contained, among the allegations integral to that claim, an assertion as to the existence of a fiduciary duty (Counterclaim ¶68) followed by an allegation as to the breach of that claimed duty (id. ¶70). In those terms, the assertedly negligent nonperformance of that purported duty would not seem to fit comfortably into the Arthur D. Little exception, even if that case's approach controlled here (as it does not). But for the reason next stated in the text, this Court will not pause to resolve that possible conundrum.

[7] Indeed, even as to contract claims the issue of Massachusetts law vs. Illinois law is not entirely clear. Although each Franchise Agreement ¶16.A specifies that the Agreement itself "shall be interpreted, construed and governed by the laws of the Commonwealth of Massachusetts," two of the three Franchise Agreements contain addenda that potentially override that provision if it is found to be in conflict with the Illinois Franchise Disclosure Act (in which event that statute applies).

9

again since Ingersoll v. Klein, 46 Ill.2d 42, 262 N.E.2d 593 (1970), applies with equal force to torts that are based on commercial relationships just as it does to conventional personal injury or like cases--see, e.g., our Court of Appeals' opinion in FMC Corp. v. Capital Cities/ABC, Inc., 915 F.2d 300, 302 (7th Cir. 1990), applying Illinois law and finding that the "most significant contacts" in a conversion case call for looking to the law of the place where the injured party is sited, not where the offending party may have possession of the converted property. In this instance both franchisees are Illinois-based (the individual franchisee is an Illinois resident, while the corporate franchisee is an Illinois corporation), and all three franchise locations are in Illinois. Clearly Illinois law applies under the "most significant contacts" test--and no Illinois case suggests, let alone holds, that the Moorman principle does not apply with full vigor here.[8]

Next to be considered is the abandoned unjust enrichment claim. Again Cherian's Final Statement cites to Massachusetts caselaw as purportedly allowing such a claim even as between

---

[8] Even though Dunkin's reply memorandum expressly and correctly identified (albeit without analysis) the choice-of-law principle just elaborated upon in the text (R. Mem. 3 n. 1), Cherian's later-filed Final Statement did not respond directly. Instead Cherian's counsel inexplicably continued to point only to Massachusetts law (more precisely, to the federal Arthur D. Little opinion construing Massachusetts law), to the exclusion of Illinois caselaw.

10

contracting parties. But as Dunkin' has said, neither Illinois law (see, e.g., such cases as <u>Murray v. Abt Assocs., Inc.</u>, 18 F.3d 1376, 1379 (7th Cir. 1994) and <u>First Commodity Traders, Inc. v. Heinold Commodities, Inc.</u>, 766 F.2d 1007, 1011 (7th Cir. 1985) and the cases cited in both of those opinions) nor Massachusetts law (see the Massachusetts cases cited in <u>Verderber v. Perry</u>, 1999 WL 525953, at *5 (1st Cir. Mar. 8)[9] permits such claims when a contract admittedly governs the litigants' relationship.[10] So the abandoned unjust enrichment claim is sanctionable as well.

Finally, Cherian's fourth withdrawn claim was grounded in conversion. Again ignoring the choice of law doctrine that looks instead to Illinois substantive law for such a tort claim, Cherian's counsel Valas cites exclusively to Massachusetts caselaw, but he also seeks to draw support from Brown

---

[9] Here is the <u>Verderber</u> statement of Massachusetts law:

Unjust enrichment is a doctrine of quasi-contract; it prevents unjust enrichment when no contract controls. Massachusetts law does not allow litigants to override an express contract by arguing unjust enrichment. See <u>Zarum v. Brass Mill Materials Corp.</u>, 334 Mass. 81, 85, 134 N.E.2d 141 (1956)(collecting cases); see also <u>Garnick & Scudder, P.C. v. Dolinsky</u>, 45 Mass.App.Ct. 925, 926, 701 N.E.2d 357 (1998)(reaching same result under related doctrine of quantum meruit).

[10] Again on the choice-of-law subject, an unjust enrichment claim is unquestionably a state law claim that would call Illinois law into play under the principles already discussed. And that is equally true whether the parties' <u>contract</u> (the existence of which precludes an unjust enrichment claim) is to be construed under Illinois law or under Massachusetts law by its terms.

11

§9.13(A)[3].

As for the cited Brown reference, what the author does there is to express his own _personal_ disagreement with a Florida District Court decision that had expressly _rejected_ a conversion claim as "unavailable because it substantially depended on the contractual obligations, including the counts for breach of the implied covenant of good faith." And as for what the courts (including that Florida court) have uniformly held (as contrasted with what some commentator would like the law to be instead), Dunkin's counsel has conclusively demonstrated that _both_ Illinois law and Massachusetts law (as is true of the law everywhere else) define conversion solely in terms of its application to a defendant's usurping for defendant's own use property that _belongs_ to someone else:

> 1. Thus Horbach v. Kaczmarek, 288 F.3d 969, 978 (7th Cir. 2002)(numerous citations and internal quotation marks omitted, emphasis in original) said this of Illinois law:
>
>> The essence of conversion is the wrongful deprivation of one who has a right to the immediate possession of the object unlawfully held. An asserted right to money normally will not support a claim for conversion. Only if the money at issue can be described as specific chattel--in other words, a specific fund or specific money in coin or bills--will conversion lie. Moreover, the plaintiff's right to the money must be absolute. It must be shown that the money claimed, or its equivalent, _at all times_ belonged to the plaintiff and that the defendant converted it to his own use.

12

2. Likewise, here is how In re 604 Columbus Ave. Realty Trust, 968 F.2d 1332, 1358 (1st Cir. 1992)(citations omitted) reported the Massachusetts law of conversion:

> Conversion consists of the wrongful exercise of dominion or control over the personal property of another. In order to recover for conversion, plaintiffs must show that at the time of the alleged conversion they had either actual possession or the right to immediate possession or control of the property in question.

Indeed, it is startling to find that Cherian somehow seeks to rely on 604 Columbus, for in that case the offending bank was guilty of taking money <u>out of accounts belonging to the Trust</u>--an application that fits the universal definition of conversion, but that does not apply at all to this case.

In those terms of both Illinois and Massachusetts law, it is not even arguable that the advertising fund "belonged" to Cherian or any other franchisee or that Cherian "had either actual possession of the right to immediate possession or control" of those funds. No claim of Dunkin's misapplication of funds paid to it under the Franchise Agreements could even colorably be framed in terms of the franchisees' ownership or actual possession, or the right to immediate possession, of those funds. In short, compelling Dunkin's counsel to expend their time and their client's money in an effort to knock out the conversion claim, only to find Cherian withdrawing that frivolous claim, also ran afoul of Section 1927.

13

## Conclusion

Each of Cherian's four withdrawn claims shares a common flaw: None could have been asserted in the objective good faith that is demanded by Section 1927. Accordingly Dunkin' is entitled to be reimbursed for the attorneys' fees and expenses that it incurred in seeking the defeat of those claims before Cherian, who should never have advanced them in the first place, withdrew them in the face of Dunkin's Rule 56 motion. This action is set for a status hearing at 8:45 a.m. June 19, 2003 to discuss the timing and procedures for quantification of such reimbursement.

Milton I. Shadur
Senior United States District Judge

Date: June 10, 2003