IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DUNKIN' DONUTS INCORPORATED, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 02 C 1272 |
| | ) |
| N.A.S.T., INC., et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

This action began with a Complaint by Dunkin' Donuts Inc.
("Dunkin'") against four defendants--N.A.S.T., Inc., SK Donuts,
Inc., Sunny Cherian and Robert Stambolic--based on their alleged
fraud, breach of contract and trademark infringement in
connection with the operation of several Dunkin' franchises.
Sunny Cherian and N.A.S.T. (hereafter collectively referred to as
"Cherian," treated as a personified male noun) initially
responded with a nine-count Counterclaim. After Cherian had
voluntarily dropped some of the counts in that Counterclaim and
other counts were dismissed on Dunkin's first motion for summary
judgment,[1] extensive additional work has been done by both sides
on all of their respective claims, including the remaining counts
in the Counterclaim.

Now Dunkin' has filed another motion for summary judgment,
seeking the dismissal of Cherian's remaining counterclaims, which

---

[1] See this Court's April 11, 2003 memorandum opinion and
order, 2003 WL 1877626.

assert (1) violation of the Illinois Franchise Disclosure Act ("Act," 815 ILCS 705/1 to 705/44[2]) due to unlawful termination, (2) breach of contract due to unlawful termination, (3) breach of contract due to inadequate training and (4) breach of the implied covenant of good faith and fair dealing, as well as stating (5) a purported claim for "preliminary and permanent injunctive relief."[3] This memorandum opinion and order grants Dunkin's motion as to all of those counts except for the charge of breach of contract due to unlawful termination. And although that assertion survives for the present, only nominal damages are awardable even if Cherian prevails on the merits at trial.

## Summary Judgment Standards

Familiar Fed. R. Civ. P. ("Rule") 56 principles impose on movant Dunkin' the burden of establishing the lack of a genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose this Court must "consider the evidentiary record in the light most favorable to the nonmoving party...and draw all reasonable inferences in his favor" (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)).[4]

---

[2] All citations to the Act will take the form "Act §--," omitting the prefatory "815 ILCS 705/."

[3] As discussed below, "preliminary and permanent injunctive relief" is of course a remedy rather than a claim in itself, and this opinion will treat it as such.

[4] In that respect this District Court's LR 56.1 is designed to facilitate the resolution of summary judgment motions by

That said, to avoid summary judgment a nonmovant still "must produce more than a scintilla of evidence to support his position" that a genuine issue of material fact exists (Pugh v. City of Attica, 259 F.3d 619, 625 (7th Cir. 2001)). In the end, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). What follows is a summary of the facts viewed in the light most favorable to Cherian, but only so long as those facts are supported by record evidence.[5]

---

calling for evidentiary statements by the moving party and itemized responses to such statements by the nonmoving party (in each instance with record citations), thus highlighting the existence or nonexistence of factual disputes. This opinion cites to Dunkin's LR 56.1(a)(3) statement of material facts as "D. St. ¶--," to Cherian's LR 56.1(b)(3)(A) response to Dunkin's statement as "C. R.St. ¶--" and to Cherian's LR 56.1(b)(3)(B) statement of additional facts as "C. Add.St. ¶--." Those "D." and "C." references will also extend to each party's memorandum of law ("Mem.") and Dunkin's reply memorandum ("R. Mem."), to any exhibit ("Ex.") and to Dunkin's Complaint ("D. Cmplt."), Cherian's Counterclaim ("C. Claim") and Dunkin's response to that pleading ("D. Ans.").

[5]  For the most part each side has complied with LR 56.1. But Cherian's submissions do not in fact "facilitate the resolution" of this summary judgment motion as well as they should have. Many of Cherian's LR 56.1(b)(3)(B) additional statements are based solely on Sunny Cherian's affidavit ("SC Aff."), an evidentiary source that (as discussed below) is seriously flawed. Indeed, at least one of those additional statements relies on that affidavit for a claim that appears, upon further investigation, to contradict Sunny Cherian's own previous deposition testimony ("SC Dep.," reproduced as C. Ex. 3): contrast C. Add.St. ¶7, claiming that sales at the Waukegan shop increased 20-69% after a drive-thru was added, with SC Dep. 442-43, claiming an increase of only "18, 20 percent" after that addition. This Court will not of course consider for present purposes any LR 56.1 submissions that are based on

3

## Background

Beginning in 1990 Cherian and Dunkin' entered into a series of four separate Franchise Agreements ("Agreements") that granted Cherian franchises, three located in Illinois and one in Wisconsin (D. Exs. 1A to 1D). In part the Agreements outlined (1) the actions or circumstances that would result in default by Cherian, (2) the termination process to be followed by Dunkin' upon such a default (including the appropriate notice and cure period that might be required) and (3) the extent of training that Dunkin' was expected to provide (Agreements ¶¶3.A-3.B and 9.A.1-9.E, ¶¶3.1-3.2 and 9.1-9.4).[6]

On February 14, 2002 Dunkin' sent Cherian a Notice of Default and Termination ("Notice") that terminated each of Cherian's franchises based on allegations of "underreporting of sales, fraud, failure to obey all laws relating to taxation, failure to maintain accurate records, and other breaches of the Franchise Agreements" (D. St. ¶1). Although speaking in terms of an immediate termination, the Notice said that Dunkin' would

---

inadmissible evidence (see <u>Cichon v. Exelon Generation Co.</u>, 401 F.3d 803, 808-10 & n.8 (7th Cir. 2005)).

[6] All of the Agreements are, at least for purposes of this motion, substantively the same, though one of the four (D. Ex. 1D) has a structure somewhat different from the other three. This opinion will therefore set out pairs of Agreement citations, with the first (preceding a comma) referring to the paragraphs in D. Exs. 1A to 1C and the second (following the comma) referring to the paragraphs in D. Ex. 1D.

4

"submit the matter to a court" if Cherian chose to contest the alleged defaults (id. ¶2). If no good cause were found for the termination, the Notice would be considered void (id.). In addition the Notice stated that "if it should be determined as a matter of law that [Cherian's] defaults are curable," Dunkin' would provide an opportunity to cure (C. Exs. 2, 4).

Just a week later (on February 21, 2002) Dunkin' filed this action (C. R.St. ¶1 says that was the same day that Cherian received the Notice), charging Cherian, among other things, with fraud and breach of contract (C. Add.St. ¶4, C. R.St. ¶1, D. Cmplt. ¶¶31-54). Cherian responded in part with his Counterclaim, and as stated at the outset of this opinion, five of Cherian's original nine Counterclaim counts are at issue here.

## Choice of Law

In a diversity case such as this one, the applicable substantive law is determined by the choice-of-law rules of the forum state (Thomas v. Guardsmark, Inc., 381 F.3d 701, 704-05 (7th Cir. 2004)). Because Illinois courts generally honor a contract's choice-of-law provision (id. at 705), this opinion will adhere to the Agreements' stipulation that they are to be "interpreted, construed and governed" in terms of Massachusetts law (Agreement ¶16A, ¶16.0)--just as the parties have done (D. Mem. 3, 11 C. Mem. 1-2).

That said, however, this Court will still entertain

5

Cherian's claim under the Act for two reasons. First, each Agreement provides that applicable state statutory cure periods, if longer than the one provided for in the Agreement, are to be applied (Agreement ¶9.B, ¶9.2). Second, Act §41's "non-waiver" provision prevents parties to Illinois franchise agreements from opting out of the Act's coverage via choice-of-law provisions (To-Am Equip. Co. v. Mitsubishi Caterpillar Forklift Am., Inc., 152 F.3d 658, 662 (7th Cir. 1998)).

## Count I: Violation of the Act

Cherian first charges that Dunkin' violated the Act by terminating the parties' franchise agreement "without good cause and without providing any opportunity to cure" (C. Claim ¶¶42-43).[7] Dunkin' responds with three arguments:

1. that the Act permits termination without notice and an opportunity to cure in cases such as this, where the termination is based on fraudulent underreporting of a franchisee's sales;

2. that even if the Act does require an opportunity to cure in the present situation, Dunkin' provided that opportunity; and

3. that even if Dunkin' were to have violated the Act,

---

[7]  Because the Act applies only to Illinois-sited franchises (Cromeens, Holloman, Sibert, Inc. v. AB Volvo, 349 F.3d 376, 385 (7th Cir. 2003)), that first claim is limited to the three Illinois franchises (D. Exs. 1A to 1C ¶1.A), not to the fourth franchise located in Wisconsin (D. Ex. 1D ¶A).

6

Cherian failed to raise a substantial question of material fact as to any resulting damages.

As to the last of those arguments, Dunkin' contends that Cherian's shortfall is fatal because damages are an essential element of Cherian's Act-based claim. And because that final argument indeed suffices to warrant summary judgment in Dunkin's favor, this opinion need not address its other contentions.

In providing a private right of action for a franchisor's violation of the Act, its Section 26 requires that there be "damages caused thereby."[8] As courts have held in a variety of contexts, a nonmovant's failure to produce sufficient evidence of the damages element of its claim calls for the entry of summary judgment against that party (see, e.g., <u>Camp Creek Hospitality Inns v. Sheraton Franchise Corp.</u>, 139 F.3d 1396, 1406 (11ᵗʰ Cir. 1998)(applying Massachusetts law); <u>Kemper/Prime Indus. Partners v. Montgomery Watson Ams., Inc.</u>, 97 C 4278, 2004 WL 725223, at *5 (N.D. Ill. Mar. 31)(applying Illinois law)). While damages "need not be proven with absolute certainty" (<u>Equity Ins. Managers of Ill., LLC v. McNichols</u>, 324 Ill.App.3d 830, 837, 755 N.E.2d 75, 80 (1ˢᵗ Dist. 2001)), they do need to be demonstrated "to a reasonable degree of certainty" and "may not be awarded on the

---

[8] Act §26 does allow one other remedy, rescission, but only when violations of the Act involve specified provisions: Act §§5, 6, 10, 11 and 15. Because none of those sections is invoked by Cherian's counterclaims, his Act-based right of action must depend on a showing of damages.

basis of conjecture or speculation" (<u>Telemark Dev. Corp. v.</u>
<u>Mengelt</u>, 313 F.3d 972, 983 (7th Cir. 2002); <u>Snelling & Snelling</u>
<u>of Mass., Inc. v. Wall</u>, 189 N.E.2d 231, 232 (Mass. 1963)). Here
the evidence Cherian has tendered fails to raise a genuine issue
of fact as to his ability to meet this standard.

To begin with, Cherian himself evinces confusion over just
what the purported sources of his damages are. Over the course
of this litigation he has variously pointed to an amorphous and
ill-defined collection of claimed injuries.[9] In the end this
Court has been able to discern only two potentially legitimate
bases for recovery: losses due to Cherian's consequent inability
(1) to sell his franchises and (2) to remodel the franchises.
But before those two possibilities are explored, this opinion
pauses a bit to review Cherian's scattershot contentions.

For example, some claimed injuries (such as losses due to
Dunkin's alleged inadequate provision of training and
supervision, SC Dep. 428-30)--even if actually sustained--were
clearly not <u>caused</u> by Dunkin's violation of the Act and thus
cannot support Cherian's Count I claim. Others, such as
Cherian's claim for losses due to his inability to relocate his

_____

[9] See, for example, C. Exs. 3 and 6-8, comprising Cherian's
required disclosures under Rule 26, his answers to
interrogatories and Sunny Cherian's deposition testimony. That
is equally true of the latter's affidavit, although as discussed
later the bulk (if not all) of any damages-related evidence in
that affidavit is excluded from consideration by Rule 37(c).

8

franchises (C. Mem. 10), are negated by the express terms of the Agreements. As Dunkin' observes, each Agreement specifically grants Cherian a franchise "at one location only" (Agreements ¶1.A, ¶¶1.0-1.1). Hence the termination of the Agreements made Cherian no less able to relocate than he was before the termination.

As for Cherian's other two asserted grounds for recovering damages, this Court finds Dunkin's non-quantitative objections unpersuasive. For example, while Dunkin' claims that its Notice "unambiguously" permitted Cherian to remodel despite the termination, the Notice also specified that any such remodeling would be done "at [Cherian's] own risk should the terminations be enforced by the court" (C. Exs. 2, 4-5). Thus Dunkin's magnanimous position that Cherian could go ahead and remodel ignores the obvious corollary that if he ended up losing his franchises, whatever he had invested in that remodeling would be lost. It must be said that such a position is frankly unworthy of assertion. Nor can Dunkin' object to a claim of losses from Cherian's inability to sell, for the fact that he might well have "no business to sell" depending on the outcome of pending litigation would certainly have influenced his ability to sell at all, let alone the price he might get for the business.

Because those nonquantitative objections to Cherian's two possible sources of damages are accordingly wanting in merit,

9

this opinion goes on to a substantive analysis of those two possibilities. On that score, despite having identified those sources, Cherian has flat-out failed to present any competent evidence to create a genuine factual predicate for recovering damages stemming from them. Notwithstanding the clear requirements of Rule 26 and Dunkin's repeated explicit requests for information as to his damages--in formal requests for the production of documents (D. Ex. 4), in interrogatories (C. Ex. 7 ¶2, C. Ex. 8 ¶2) and in the course of Sunny Cherian's deposition--Cherian has refused to offer any more than the kind of vague and unsubstantiated "conjecture or speculation" decried by the caselaw.

For example, Rule 26(c) expressly requires this level of disclosure:

> a computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered....

In that respect Cherian is completely deficient. All he does instead is to proffer a blithe statement of his purported damages, assertedly based on "the value of [the] business, lost opportunity costs and related damages," and said to be "in excess of $2,000,000" (C. Ex. 6 ¶3).

No attempt is made to allocate the purported $2 million lump

10

sum among the "value of the business," the "lost opportunity costs" and Cherian's unspecified "related damages" (id.). Even more fundamentally, in lieu of the Rule-26-required "specific" computation of losses (Clayman v. Starwood Hotels & Resorts Worldwide, 343 F.Supp.2d 1037, 1047 (D. Kan. 2004)), Cherian states vaguely that his determination was "based on an analysis of the sales of the defendants' shops and the sales at the shops in the area with whom Dunkin' Donuts, Inc. has provided favored status," with no effort at further explanation (C. Ex. 6 ¶3). And as to documentary support, Cherian notes with equal vagueness that some documents have been "produced herewith," while others are either in "the Waukegan shop," at Sunny Cherian's home, in the possession of accountant Daniel Vieth or in Dunkin's possession--no attempt is made to specify which documents are actually relevant or at which of those several locations they might actually be found (id. ¶2).

Nor did Cherian's eventual answers to Dunkin's repeated interrogatory requests identify any real evidence.[10] To be sure,

---

[10] Both interrogatories asked Cherian to identify, for each of his counterclaim counts, "(a) the monetary amount of all damages you claim to have suffered as a result of that wrongdoing; (b) the method of calculation; (c) the formulae used in those calculations; (d) the count to which the item of damages relates; (e) the category into which each item of damage falls, i.e. general damages, special or consequential damages, interest and any other relevant categories; (f) the factual basis for each item of damages; and (g) all supporting documents used or prepared in those calculations" (C. Ex. 7 ¶2, C. Ex. 8 ¶2). Cherian's first answer was completely nonresponsive, and it was

11

those answers presented additional numbers, but they too were
equally unsubstantiated, with Cherian vaguely asserting that "as
a direct result of Dunkin's conduct, the defendants suffered
damages in excess of $1,000,000," that the defendants have
"suffered diminished value of their business in an amount in
excess of $400,000" and have ultimately lost any value of the
business and that "the defendants have been unable to sell or
transfer their shops for their value, which is well in excess of
$1,000,000" (C. Ex. 8 ¶2).[11] Cherian's only attempt to ground
those numbers at all is his conclusory assertion that "[d]amages
were calculated using the defendant's financials and standard
valuation techniques, including the comparison of the sale price
of similar businesses" (id.). There is no indication of what
those techniques were, which financials were used or which

---

only after Dunkin' again asked the same question that Cherian's
"First Supplemental Answers to Second Set of Interrogatories"
even attempted some level of response (C. Ex. 8 ¶2). What
follows in the text addresses the inadequacy of that second
effort.

[11] Cherian also seeks to include a claim for royalties and
advertising fees "in excess of $400,000" that he paid, but from
which he assertedly received no support or benefit (C. Ex. 8 ¶2).
That claim as to the asserted misuse of advertising funds was
addressed in Dunkin's first motion for summary judgment and need
not be revisited here. Cherian further claims "out of pocket
expenses, including costs and attorneys' fees, in excess of
$100,000" (C. Ex. 8 ¶2), but costs and attorneys' fees are not of
course "damages" in this context (Summit Valley Indus., Inc. v.
Local 112, United Bhd. of Carpenters & Joiners of Am., 456 U.S.
717, 722-23 (1982)).

12

"similar" businesses were used for comparison.[12] That totally flunks the Rule 56(e) requirement of <u>admissible</u> evidence.

Moreover, although Rule 33(d) does allow a party to produce business records rather than to answer an interrogatory directly where the burden of deriving an answer from those records is just as great for the producing party as for the inquiring party, simply referring Dunkin' (and this Court) to "documents in [Dunkin's] possession," and "documents produced in this case" (C. Ex. 8 ¶2) does not begin to meet the requirements of that Rule. Any party that seeks to pursue that Rule 33(d) option has the duty to specify "by category and location, the records from which answers to interrogatories can be derived" (<u>In re Sulfuric Acid Antitrust Litig.</u>, 231 F.R.D. 351, 366 (N.D. Ill. 2005), quoting the 1980 Advisory Committee Note to Rule 33(c), now 33(d)). Cherian's response--which offers only the generality that the documents "in [Dunkin's] possession" included "the defendants' financial records, documents evidencing the sale prices of the other franchised units and documents evidencing payments received" (C. Ex. 8 ¶2)--falls far short of that duty.

---

[12] While Cherian's interrogatory response mentioned that "discovery is ongoing" and suggested the possibility of his use of an expert "to present evidence of damages" (C. Ex. 8 ¶2), in the end Cherian included no such expert testimony or report either in his LR 56.1(b)(3)(B) statement or in his exhibits. In fact, the one mention of experts that Cherian's filings include is his admission that the experts he commissioned in regard to other parts of the larger litigation, Messrs. Vieth and Greene, "did not attempt to quantify damages" (C. R.St. ¶8).

13

Sunny Cherian's deposition testimony was no better. When asked point-blank whether he or his businesses suffered any damages as a result of Dunkin's termination, he did his level best to avoid answering, offering only vague, rambling and unsupported claims of "financial damage, emotional distress, trouble with my family and trouble with my whole line of things that I was trying to build, my credibility among the franchisees, my name, my fame" (SC Dep. 367).[13] His sole attempt to put some dollar value on his termination-based losses was a claim that he had lost "$150,000" as a result of Dunkin's lawsuit (id. 437). But he freely acknowledged that was merely a "ballpark" estimate, and when pressed as to the basis for that figure and any actual calculations that he made, he offered a meandering litany of improper and irrelevant bases (id. 437-38)--and in the end he simply refused to say whether he had actually done any written calculations (id. 438-39).

Finally, Cherian's current filings include the post-

---

[13] He then went on to supplement those inadequacies with equally vague and unsubstantiated claims that he suffered "monetary damages" from "the opportunity to open up a business, to open up more restaurants, the opportunity to build my so-called infrastructure, to expand my business where I could potentially earn more income that [sic] what I am today, the cost of defending myself through my counsel...the potential money that I could use from the business to invest in different things which creates...trouble as I go along" (id. 367-68). To the contrary, his only non-amorphous response to that line of questioning was his admission that his sales have actually gone up since this lawsuit was initiated (id. 369).

14

discovery affidavit of Sunny Cherian and three sets of financial documents: a "worksheet" showing "gross sales" for three of the shops, taken from "weekly sales reports" (C. Ex. 12), a set of tax returns dated from 1998 to 2004 (C. Ex. 13) and "some of the sales performance numbers produced by Dunkin['] showing ordinary market growth in the Midwest Dunkin' Donuts market" (C. Ex. 14, SC Aff. ¶20). Again those offerings fall short of the mark.

As for the affidavit, it is fatally deficient in more than one respect. To begin with, Rule 37(c) bars any consideration of much of its content, for under that Rule any party that fails to disclose information required by Rule 26(a)--such as the damages information required by Rule 26(a)(1)(C)--cannot use such evidence at trial, during a hearing or on a motion. That bar operates automatically unless, as Rule 37(c)(1) states, there is "substantial justification" for the failed disclosure or the failed disclosure was "harmless" (see, e.g., Design Strategies, Inc. v. Davis, 367 F.Supp.2d 630, 633-36 (S.D. N.Y. 2005)).

In this instance Sunny Cherian's affidavit has for the first time set out claims and information as to purported damages stemming from losses due to his inability to remodel the franchise locations (SC Aff. ¶¶10-11, 14-18).[14] Nor has Cherian

---

[14] While Cherian's Rule 26 disclosure did include a vague claim of damages due to "lost opportunity costs" (C. Ex. 6 ¶3), and while Sunny Cherian did note in his deposition that the Waukegan shop had increased its sales "18, 20 percent" after its remodeling (SC Dep. 443), neither reference offered any

15

offered any justification (substantial or otherwise) for his failure to have provided that information either as part of his Rule 26(a) disclosures or in response to Dunkin's repeated requests. That omission cannot be labeled as harmless, with discovery having been closed, well before the current motion, pursuant to the express agreement of both sets of litigants (see <u>Wilson v. Pope</u>, No. 96 C 5818, 1997 WL 403684, at *8 (N.D. Ill. July 14)).

In short, Rule 37(c) prohibits this Court from considering the affidavit, at least as to evidence regarding damages due to Cherian's inability to remodel his franchises (see <u>Advanced Cleanroom Techs. v. Newhouse</u>, No. 00 C 6623, 2002 WL 206960, at *4-*5 (N.D. Ill. Feb. 11)). Indeed, even if this Court could properly consider the affidavit in its entirety (as it should not), the affidavit would offer no real aid to Cherian, for it too provides nothing more than Sunny Cherian's speculative and unsubstantiated claims of damages.

Cherian's three sets of documentary evidence are little better, for whatever substantive support they might arguably provide is still inadequate. While those documents finally set out some more precise figures for possible consideration (assuming of course that they had been properly disclosed in the

---

indication that Cherian would go on to seek damages for losses due to an inability to remodel other shops.

16

first place, something that Cherian does not demonstrate[15]),
Cherian offers no explanation of just how those figures relate to
his asserted damage claims, or any sense of the calculations that
translate that raw data into his final and overgeneralized damage
totals.   Certainly Sunny Cherian lacks any credentials that would
justify crediting his wholly speculative and unsupported numbers.

In the end, then, Cherian's unwillingness or inability (or
both) to present competent and admissible evidence of
damages--despite repeated demands, requirements and opportunities
to do so--dooms his Act-based claim.   Dunkin' is entitled to
judgment as a matter of law on that claim.

## Count II:  Breach of Contract

Like his Act-based counterpart, Cherian's breach of contract
counterclaim is based on Dunkin's alleged termination of the
Agreements "without good cause and without providing Cherian any
opportunity to cure" (C. Claim ¶50).   As might be expected,
Dunkin' responds with a similar set of arguments:

---

[15]   Although the Sunny Cherian affidavit says those
documents were "in Dunkin's possession, and were produced and in
the possession of Dunkin' early in the litigation" (SC Aff. ¶20),
it is not clear just what that means.   If in fact Cherian had
already handed over, or at least explicitly identified, those
documents in direct response to Dunkin's discovery requests, they
might perhaps be viewed as having been disclosed properly.   If
however, as seems more likely, these documents were merely part
of Cherian's vague, Rule-33(d)-violative "go fish" response to
Dunkin's interrogatories, disclosure was not proper under Rule
37(c).   In any event, Cherian has not met his burden of showing
compliance with that Rule.

17

1. It contends that its termination without an opportunity to cure did not violate the Agreements' provisions.

2. It argues that even if the Agreements did require an opportunity to cure, it provided such an opportunity.

3. It urges that, just as in the context of the Act, Cherian failed to present evidence that raised the required genuine issue of material fact as to his damages.

On the damages front, the quality of Cherian's evidence is obviously no better here than in the Act's context. But this time that absence of probative quality does not compel dismissal of the entire claim. Under Massachusetts common law a breach of contract carries with it "at least nominal damages" (<u>Nathan v. Tremont Storage Warehouse</u>, 102 N.E.2d 421, 423 (Mass. 1951)), so that even if a claimant cannot prove actual damages its claim can still get to a jury (<u>Flynn v. AK Peters, Ltd.</u>, 377 F.3d 13, 23 (1st Cir. 2004), citing <u>Nathan</u>).

Accordingly the inadequacy of proof as to actual damages stemming from an asserted breach of contract does not of itself (as it did in the Act's context) bar Cherian's overall claim. That then requires analysis of the remaining elements of that claim.

If those elements included the need for notice and an opportunity to cure any deficiencies in Cherian's contract

18

performance, Dunkin' could not prevail at the summary judgment stage as to that component. Under the Agreements the franchisee has "the right to cure [his] default under this Agreement within the applicable period set forth below following written notice of default" (Agreements ¶¶9.B, 9.1), and termination is allowed only "if [the] FRANCHISEE fails to cure to DUNKIN' DONUTS['] satisfaction within the applicable period following notice from DUNKIN' DONUTS" (Agreements ¶¶9D, 9.4).

Obviously (and logically) some time--some actual opportunity to fix the default--had to be allowed between the notice of default and the termination. Just as obviously Dunkin' did not afford Cherian that opportunity. Its Notice, received by Cherian on February 21, 2002, informed him that Dunkin' had "hereby, without further notice, terminate[d]" his franchises and instructed him to "immediately take such actions as are necessary to comply with [his] post-termination obligations" (C. Ex. 2 at 3-4). No pretermination opportunity to cure was provided-- instead the "opportunity" that was offered could come only <u>after</u> the termination, predicated on a "determin[ation] as a matter of law that [Cherian's] defaults are curable" (<u>id</u>. at 4). Any purported opportunity to cure that arises only after termination, and only after suit has been filed, is no opportunity at all (see <u>Smoot v. Mobil Oil Corp.</u>, 722 F.Supp. 849, 855 n.4 (D. Mss.

1989)).[16]

In the end, then, a successful dismissal of Cherian's breach of contract counterclaim hinges on Dunkin's contention that Cherian's claimed defaults were such that the Agreements did not require notice and an opportunity to cure before termination. In response Cherian does not dispute that the Agreements allow Dunkin' to terminate the Agreements without opportunity for cure when the franchisee "intentionally underreports GROSS SALES or falsifies financial data" (Agreements ¶¶9.B.4, 9.1.3). Instead Cherian argues (1) that it is Dunkin's burden to demonstrate that Cherian engaged in such intentional underreporting and (b) that Dunkin' did not meet that burden (C. Mem. 4). This Court agrees with Cherian on both counts.

As Celotex, 477 U.S. at 322-23 teaches, to avoid summary judgment a nonmovant must make an evidentiary showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Normally that burden for Rule 56 purposes falls on the plaintiff. But when elements can "fairly be characterized as affirmative defenses or exemptions," that burden of persuasion shifts to the defendant (Schaffer v. Weast, 126 S.Ct. 528, 534

---

[16] Nor could the void be filled by Dunkin's promises to leave enforcement of the termination to a court of law or to "consider this Notice to be void" if and when it was determined that Dunkin' actually had no good cause for termination.

(2005); <u>U.S. Liability Ins. Co. v. Selman</u>, 70 F.3d 684, 691 (1ˢᵗ
Cir. 1995)). And here several factors point to the treatment of
Cherian's alleged misconduct as just such an "affirmative defense
or exemption."

For one thing, the form of Dunkin's argument fits the
classic template of affirmative defenses: Its Mem. 1 admits
Cherian's basic factual allegation--that Dunkin' terminated the
Agreements without notice and cure--but argues that the
termination does not violate the Agreements and is therefore not
actionable (5 Charles A. Wright & Arthur R. Miller, <u>Federal
Practice and Procedure</u> §1271, at 585 (3d ed. 2004)).[17] Indeed,
Massachusetts courts have explicitly held that the existence of
"just cause" to terminate a contract is an affirmative defense
(see, e.g., <u>Goldhor v. Hampshire Coll.</u>, 521 N.E.2d 1381, 1385
(Mass. App. Ct. 1988)). Moreover, the Agreements make notice-
and-opportunity-to-cure the norm, while termination without that
opportunity is a narrowly delineated exception (see Agreements
¶¶9.B-9.B.4, 9.1-9.2).

With Dunkin's R. Mem. 8-9 having denied that it bore the
burden to begin with, it is not surprising that Dunkin' has

_____

[17] While Dunkin's Answer pleaded Cherian's underreporting
as an affirmative defense, this Court has held that of itself is
not dispositive of the proper characterization (<u>Bobbitt v.
Victorian House, Inc.</u>, 532 F.Supp. 734, 736 (N.D. Ill. 1982)).

21

failed to meet it.[18]  All that Dunkin' has had to say on that
subject at this point are its allegations in its original Amended
Complaint that investigators in the spring of 2000 and summer of
2001 witnessed the alleged misconduct by Cherian (D. Cmplt. ¶42).
That pleading assertion does not itself cut it under Rule 56(e)
(see Anderson, 477 U.S. at 256).

Because Dunkin' has thus failed to satisfy its burden as to
Cherian's intentional underreporting of sales, it has not taken
the case out of the notice-and-opportunity-to-cure provisions of
the Agreements.  Its motion for summary judgment on Count II is
denied--a Pyrrhic victory for Cherian, for it has earlier been
shown that even if he were to prevail at trial on this claim, he
could recover only nominal damages.

### Count III:  Breach of Contract--Inadequate Training

Cherian's Count III also presents a breach of contract
claim, this time based on Dunkin's alleged failure to provide him

---

[18]  D. R. Mem. 9 n.4, urging that "Cherian has failed to
establish a genuine issue of material fact with respect to an
essential element of his Counterclaims--damages," goes on to
assert:

> There is certainly no requirement--at this stage--for
> Dunkin to "prove that Cherian is guilty of fraudulent
> violations of tax law [or] intentional underreporting
> of sales."  Opp. at 4.  That will occur at trial.

But it is Dunkin', not Cherian, that has moved for summary
judgment, and it must show the adequacy of its immediate
termination notice by providing evidence of Cherian's noncurable
violations of the Agreements.

with the level of training and support required by the Agreements. But that claim is barred by his failure to have advanced it within Massachusetts' six-year limitations period for contract claims (Mass. Gen. Laws ch. 260, §2). Under Massachusetts law the statute begins to run as soon as a party is aware of the facts giving rise to the claim, whether or not he recognized their potential for injury at that time--unless, that is, the wrong is "inherently unknowable" (as was not the case here)(Int'l Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc., 560 N.E.2d 122, 126 (Mass. App. Ct. 1990)).

In those terms Cherian has made the fatal admission that he was aware of Dunkin's alleged failure to properly train him "as soon as [he] became a franchisee," well more than six years before he brought his claim (C. R.St. ¶10). And D. Mem. 11-13 and D. R. Mem. 13-15 have more than amply demonstrated the bogus nature of Cherian's efforts to extricate himself from the effects of that admission, as well as (once again) the absence of any hint of compensable damages flowing from Dunkin's asserted breach.[19] Count III is unsustainable as a matter of law.

### Count IV: Breach of Implied Covenant

Cherian's Count IV asserts that Dunkin' has violated the

---

[19] In fact, Dunkin' also shows convincingly that Cherian's lack of training claim overreads Dunkin's duties under the Agreements--but it is unnecessary to parse the Agreements' provisions in that regard, when Cherian's claim has succumbed on other grounds in any event.

implied covenant of good faith and fair dealing that Massachusetts law reads into every contract (<u>Anthony's Pier Four, Inc. v. HBC Assocs.</u>, 583 N.E.2d 806, 820 (Mass. 1991)). In attempted support of that claim Cherian alleges such grounds as Dunkin's purported attempt "through chicanery, dirty tricks and subterfuge to obtain Cherian's shop by forfeiture" and its purported employment of "faulty auditing procedures, methods and formulas to create a false impression that Cherian was underreporting its sales" (C. Claim ¶67).

As D. Mem. 13 points out, many of those assertions simply restate the earlier-alleged breach of contract claims. But a claimed breach of the covenant of good faith and fair dealing is more demanding than a mine-run breach of contract claim (<u>Christensen v. Kingston Sch. Comm.</u>, 360 F.Supp.2d 212, 226 (D. Mass. 2005)): There must also be some ingredient of bad faith such as "deceit" or "pretextual or coercive" behavior (<u>id</u>. at 226-27) or "dishonest purpose, conscious doing of wrong, or breach of duty through motive of self-interest or ill will" (<u>Hartford Accident & Indem. Co. v. Millis Roofing & Sheet Metal, Inc.</u>, 418 N.E.2d 645, 647 (Mass. App. Ct. 1981)).

In that regard Cherian has failed to produce any competent evidence of such bad faith conduct on Dunkin's part. All he offers are two completely unsubstantiated allegations:

       1. that Dunkin' was "upset" with Cherian for

critiquing Dunkin's "point of sale systems" (C. Add.St. ¶9) and

    2.   that Cherian had "good reason to believe that Dunkin's efforts to terminate him and its refusal to offer him any reasonable opportunity to cure alleged defaults was a direct result of his position as a franchisee leader and the actions that he took as a leader" (id. ¶11).

Although the pretextual invocation of contract provisions can ground such a breach of covenant claim (see, e.g., Anthony's Pier Four, 583 N.E.2d at 820), Cherian offers no evidentiary support at all for the alleged motivation. It is not enough for Cherian to rely on the drawing of inferences in his favor--he must still produce some competent evidence to provide a genuine issue of material fact as to that element of his claim (Pugh, 259 F.3d at 625). Because Cherian has failed to do so, Count VIII of Cherian's counterclaim falls as well.

## Count IX: Equitable Remedies

Cherian's final "claim" for "preliminary and permanent injunctive relief" is not a claim at all, but merely a remedy (Noah v. Enesco Corp., 911 F.Supp. 305, 307 (N.D. Ill. 1995)). And because Count IX thus fails to state a claim in any event, this Court grants Dunkin's motion for summary judgment in that respect (id.).

That however does not obviate the need to discuss equitable

remedies, for Cherian's Counterclaim demands for relief also include injunctive relief and rescission of the Agreements. This opinion therefore concludes with a modest review of those demands.

First, despite requesting rescission in his Counterclaim, Cherian essentially proceeds to ignore the issue in his later filings. While Massachusetts law (like Illinois law) recognizes a number of potential grounds for contractual rescission, Cherian proffers no indication as to the grounds on which his demand relies, let alone any argument that such grounds exist here. It is not this Court's job to make parties' arguments for them, and it will not do so in this case. Cherian's prayer for rescission of the Agreements is denied.

Cherian also asks for both preliminary and permanent injunctive relief that would enjoin Dunkin' from "closing [his] shop or otherwise interfering with [his] business" (C. Claim Prayer for Relief ¶4). This opinion first turns to the standards for such relief (including choice-of-law considerations), then addresses Cherian's deficiencies in claiming such relief.

Preliminary injunctions under Rule 65 are governed by federal law, as to which this Court continues to view <u>Roland Mach. Co. v. Dresser Indus., Inc.</u>, 749 F.2d 380, 385-88 (7th Cir. 1984) as providing the most felicitous exposition. Although the awarding of permanent injunctions in a diversity case, on the

other hand, would appear to be governed by the appropriate state's substantive law (see, e.g., <u>Capital Tool & Mfg. Co. v. Maschinenfabrik Herkules</u>, 837 F.2d 171, 172 (4th Cir. 1988)), Massachusetts seems to refer back to federal law for its permanent injunction standards (<u>Mandell v. Town of Reading</u>, No. CIV-A. 002564-F, 2000 WL 1873987, at *4 (Mass. Super. Dec. 11)). Those standards differ from preliminary injunction standards only in that rather than showing "a mere likelihood of success," the party seeking a permanent injunction must show actual success on the merits (<u>K-Mart Corp. v. Oriental Plaza, Inc.</u>, 875 F.2d 907, 914-15 (1st Cir. 1989)).

Any prospect of preliminary injunctive relief can be trashed at the outset. It is absurd to speak of such an extraordinary interim remedy in the context of this years-old lawsuit (see such cases as <u>USAchem, Inc. v. Goldstein</u>, 512 F.2d 163, 168-69 (2d Cir. 1975)).

As for a permanent injunction, Cherian plainly strikes out. For example, he offers no evidence, argument or even an allegation that the "balance of harms" between the parties favors granting such an injunction, or that the public interest would not be disserved if an injunction were granted. Indeed, even the inadequacy of a remedy at law is problematic--but it is unnecessary to address that or the other elements on which Cherian bears the burden, for his failure to satisfy <u>any</u> of the

conditions calls for the denial of injunctive relief.

## Conclusion

In all save one respect--Cherian's common law claim for
breach of contract due to the assertedly unlawful termination of
the Agreements--there is no genuine issue of material fact, and
Dunkin' is entitled to a judgment as a matter of law. This Court
therefore grants its motion for summary judgment as to each of
Cherian's remaining counts. As for the single count that
survives, only nominal damages will be available should Cherian
prevail upon the merits at trial. This action is set for a
status hearing at 8:45 a.m. January 12, 2006 to discuss the
procedure and timing for the disposition of that final aspect of
Cherian's Counterclaim and for the resolution of Dunkin's claims.

_____
Milton I. Shadur
Senior United States District Judge

Date:  December 28, 2005

28